UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROGER GIBSON, Individually and on Behalf of All Others Similarly Situated,<br><br>                                    Plaintiff,<br><br>v.<br><br>ARCIMOTO INC., MARK FROHNMAYER, and DOUGLAS M. CAMPOLI,<br><br>                                    Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Roger Gibson ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Arcimoto Inc. ("Arcimoto" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of all persons and entities who purchased the publicly traded securities of Arcimoto between February 14, 2018 and March 22, 2021, both dates inclusive (the "Class Period").  Plaintiff seeks to recover compensable damages

caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements entered and subsequent damages took place within this Judicial District.  Pursuant to Arcimoto's most recent annual report, as amended and filed on Form 10-K/A with the SEC on April 5, 2021, as of March 30, 2021, there were approximately 35,758,090 shares of the Company's common stock issued and outstanding. Arcimoto's common stock trades on the Nasdaq Capital Market ("NASDAQ").  Accordingly, there are presumably hundreds, if not thousands, of investors in Arcimoto's common stock located within the U.S., some of whom undoubtedly reside in this Judicial District.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying Certification, incorporated by reference herein, purchased Arcimoto's securities during the Class Period and was economically damaged thereby.

7.      Defendant Arcimoto is purportedly engaged in the business of manufacturing ultra-efficient three-wheeled electric vehicles.  The Company's products include the Fun Utility Vehicle ("FUV").  Arcimoto is incorporated and headquartered in Oregon.  Arcimoto shares traded on the NASDAQ under ticker symbol "FUV" during the Class Period.

8.      Defendant Mark Frohnmayer ("Frohnmayer") was Chief Executive Officer of Arcimoto at all relevant times.

9.      Defendant Douglas M. Campoli ("Campoli") was Chief Financial Officer of Arcimoto at all relevant times.

10.      Defendants Frohnmayer and Campoli are sometimes referred to herein as the "Individual Defendants."

11.      Each of the Individual Defendants: (i) directly participated in the management of the Company; (ii) was directly involved in the day-to-day operations of the Company at the highest levels; (iii) was privy to confidential proprietary information concerning the Company and its business and operations; (iv) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein; (v) was directly or indirectly involved in the oversight or implementation of the Company's internal controls; (vi) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or (vii) approved or ratified these statements in violation of the federal securities laws.

12.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

14.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Background**

15.     Arcimoto stated in press releases from 2018 to 2020 that the Company had received preorders for its FUV.  Arcimoto stated that it received over 400 preorders in total.

16.     Arcimoto further generated excitement for its vehicles by announcing pilot programs with various entities.

**Materially False and Misleading Statements Issued During the Class Period**

17.     The Class Period begins on February 14, 2018, when Arcimoto published a press release announcing its partnership with HULA Holdings ("HULA"), stating, in relevant part:

> Arcimoto, Inc.® (NASDAQ: FUV) — makers of the world's first Fun Utility Vehicle® (FUV®) — an affordable, practical, and thrilling pure electric vehicle for everyday commuters and fleets, today announced a partnership with HULA Holdings to launch EV Oasis, a one-of-a-kind electric vehicle charging, education, and rental center in Southern California.
>
> Expected to open in San Diego, California in the summer of 2018, EV Oasis aims to be the quintessential west coast sustainable transportation hub. Planned amenities include 10 DC fast chargers and 24 Level 2 AC connections, educational kiosks, a local organic coffee shop, and an electric vehicle rental center featuring the Arcimoto FUV. ***HULA Holdings has placed a deposit for 100 all-electric Arcimoto FUVs as part of their rental operation.***

(Emphasis added.)

18.    On June 3, 2019, Arcimoto published a press release in which the Company detailed

its agreement with GoCar Tours, stating, in relevant part:

> Arcimoto, Inc.®, (NASDAQ: FUV) makers of the Fun Utility Vehicle® (FUV®),
> Rapid Responder™, and Deliverator™ — affordable, practical, and joyful pure
> electric vehicles for everyday commuters and fleets — announced today that *it will*
> *develop a next-gen fleet of FUVs with GoCar Tours for GPS-guided tours of San*
> *Francisco*.
>
> *An initial order of 40 FUVs* will be outfitted with GoCar's patented GoCar
> Network technology, which allows users to explore the city on their own schedule
> at their own pace. The GoCar's mobile tour guide, the world's first GPS-guided
> tour, will give directions, crack jokes, recommend restaurants, and tell the
> legendary stories that bring San Francisco to life.

(Emphases added.)

19.    On June 19, 2019, Arcimoto announced a collaboration with Sol Mar Vida in a

press release, stating, in relevant part:

> Arcimoto, Inc.®, (NASDAQ: FUV) makers of the Fun Utility Vehicle® (FUV®),
> Rapid Responder™, and Deliverator™ — affordable, practical, and joyful pure
> electric vehicles for everyday commuters and fleets — announced today that it
> *plans to deploy the first international fleet of pure electric FUVs to Costa Rica*
> *starting later this year in collaboration with Sol Mar Vida*.
>
> *Over the span of three years, Arcimoto and Sol Mar Vida plan to deploy 100*
> *FUVs to be used as tourist rentals in Guanacaste province.* Users will be able to
> rent the FUV directly at beachside hotels from Tamarindo to Playa Hermosa, a
> stunning stretch of white-sand beaches and world-class surf breaks known as the
> Gold Coast of Costa Rica.

(Emphases added.)

20.    On October 2, 2019, Arcimoto issued a press release announcing its first rental

franchisee, stating, in relevant part:

> Arcimoto, Inc.®, (NASDAQ: FUV) makers of the Fun Utility Vehicle® (FUV®),
> Rapid Responder™, and Deliverator™ — affordable, practical, and joyful pure
> electric vehicles for everyday commuters and fleets — announced today that it has
> signed its *first rental franchise, which will open in the Florida Keys and be*
> *operated by Key West-based franchisee R-KEY-MOTO, LLC*.

"We think Key West will be an amazing home for our first rental franchise and pilot of our rental franchise model," said Arcimoto founder and president Mark Frohnmayer. "We are very excited to partner with the R-KEY-MOTO team, combining their local market expertise and resources with Arcimoto's ultra-efficient and very fun vehicles."

Located at the Stock Island Marina Village, ***the new FUV Hub location will house 21 FUVs*** to be used as rental vehicles for tourists and cruise ship passengers to explore Key West, one of the most popular tourist destinations in the world. In addition, the FUV Hub will share vehicles with the A&B Marina Complex and the Perry Hotel Key West. Guests will be able to rent FUVs directly from the concierge and explore Stock Island and Key West.

* * *

The Florida Keys will be the first Arcimoto rental franchise, and ***the fourth FUV rental location, with partnerships previously announced with Hula Multimodal in San Diego and Encinitas, Calif., as well as with GoCar Tours in San Francisco***. In the Arcimoto franchise model, rental franchises will utilize Arcimoto branding and technologies, including the Arcimoto mobile app, to create a one-of-a-kind tourism experience and unforgettable joyride.

(Emphases added.)

21.     On October 30, 2019, Arcimoto issued a press release announcing its distribution agreement with the New Zealand-based EV Distributors, stating, in relevant part:

Arcimoto, Inc.®, (NASDAQ:FUV) makers of the Fun Utility Vehicle® (FUV®), Rapid Responder™, and Deliverator™ - affordable, practical, and joyful pure electric vehicles for everyday commuters and fleets - announced today that it has ***entered into a distribution agreement with New Zealand-based EV Distributors to deliver a minimum of 160 Arcimoto vehicles over the next four years***. To kick off the agreement, Arcimoto has made its first international vehicle shipment, and three FUVs are now bound for Auckland, scheduled to arrive in November.

(Emphasis added.)

22.     On March 10, 2020, Arcimoto announced a pilot program with the Eugene Springfield Fire Department, stating, in relevant part:

***Arcimoto, Inc.® (NASDAQ: FUV) and Eugene Springfield Fire Department announced today that they have begun the first pilot program for testing the Rapid Responder™***, a pure electric three-wheeled vehicle designed for first

6

responders to more quickly and efficiently reach emergencies at a fraction of the economic and environmental costs of traditional diesel-powered vehicles.

(Emphasis added.)

23.    On July 22, 2020, Arcimoto announced a pilot program with Wahlburgers, a casual

dining burger restaurant, to test one Arcimoto's vehicles, stating, in relevant part:

Arcimoto, Inc.® (NASDAQ: FUV), makers of the Fun Utility Vehicle® (FUV®), Rapid Responder™, and Deliverator™—affordable, practical, and joyful pure electric vehicles for everyday commuters and fleets—and Wahlburgers are teaming up on *a pilot program to field test the Deliverator, Arcimoto's ultra-efficient, three-wheel electric vehicle designed for local and last-mile delivery. The pilot program is anticipated to begin this August at the newest Wahlburgers location coming to the boardwalk of the world-renowned Historic Key West Seaport* from the restaurant brand founded by Chef Paul Wahlberg along with brothers Donnie and Mark.

(Emphasis added.)

24.    On November 19, 2020, Arcimoto issued a press release announcing its first

municipal pilot program with the City of Orlando, stating, in relevant part:

Arcimoto, Inc.® (NASDAQ: FUV), makers of affordable, practical, and joyful pure electric vehicles for everyday commuters and fleets, today *announced that it has entered into its first municipal fleet pilot program, with the City of Orlando. Together, the City will test Arcimoto vehicles across six city departments*, continuing Mayor Buddy Dyer's efforts to transform Orlando into one of the most environmentally-friendly, economically and socially vibrant communities in the nation.

* * *

Over the course of the 90-day pilot program, Arcimoto vehicles are expected to be tested by Orlando Fire Department, Police Department, Code Enforcement Division, Permitting Services, Venues, and Parking Enforcement. This is the latest milestone of the City's Office of Sustainability and Resiliency, which has recently worked to convert hundreds of fleet vehicles to electric, hybrid, or compressed natural gas; is working to enable more than 500 Level 2 charging stations citywide; and launched sharing programs for cars, scooters, and bikes.

(Emphasis added.)

25.    The statements referenced in ¶¶ 17-24 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the preorders of Arcimoto's FUVs were fabricated or never completed, with only 19 units delivered out of an alleged preorder of 422; (ii) Arcimoto failed to disclose to customers that nearly 100% of its vehicles delivered were under safety recall; (iii) Arcimoto's largest customer, R-Key-Moto, was an undisclosed related party owned by insider FOD Capital, LLC; (iv) Arcimoto's partnership with HULA was an undisclosed related party transaction; and (v) as a result, defendants' public statements were materially false and/or misleading at all relevant times.

### The Truth Emerges

26.    On March 23, 2021, before markets opened, Bonitas Research published a report (the "Bonitas Report") revealing that Arcimoto had misled the investing public by fabricating its preorders.  The Bonitas Report stated, in relevant part:

> In March 2021 we reviewed six (6) different partnerships touted by Arcimoto since 2018. Specifically for these partnerships, we found that *less than 5% of Arcimoto's "pre-orders" were delivered.*
>
> The below table is a summary of our findings.

| Announced Partners | Claimed Pre-Order # | Delivered Unit # | Announcement Date |
|---|---|---|---|
| Arcimoto Key West | 21 | 13 | 02-Oct-19 |
| Hula | 100 | 0 | 14-Feb-18 |
| GoCar Tours (SF) | 40 | 2 | 03-Oct-19 |
| Sol Mar Vida | 100 | 0 | 19-Jun-19 |
| New Zealand distributor | 160 | 3 | 30-Oct-19 |
| Wahlburgers Key West | 1 | 1 | 22-Jul-20 |
| **Total** | **422** | **19** | |
| *% Delivered* | | *4.5%* | |

*Source: FUV Press Releases; Bonitas Outbound Calls to Customers*

(Emphasis added.)

27. The Bonitas Report also stated that Arcimoto "concealed safety concerns from customers and investors," stating, in relevant part:

> ***On November 18, 2020, Arcimoto filed a total production recall notice with the United States Government's federal agency, the National Highway Traffic Safety Administration*** ("NHTSA") (https://www.nhtsa.gov/), due to safety issues with the electronic drivers in the vehicles which can "lead to unexpected battery shutdown and immediate loss of traction-power".

> \* \* \*

> ***Instead of notifying customers and investors of the bad news, the next day on November 19, 2020 Arcimoto management promoted a 90-day trial with the City of Orlando's first responder units.*** In March 2021 we spoke with sales representatives at both Arcimoto Key West and GoCar Tours and confirmed that ***neither customer had been notified of Arcimoto's November 2020 product safety recall***. Arcimoto's November 2020 recall was ***preceded by two other recalls in March & May 2020*** due to non-compliant brake hoses and improper traction-power harness that can lead to, among other things, "risk of fire, and loss of traction-power".

(Emphases added.)

28. The Bontias Report further revealed that Arcimoto's largest customer, R-Key-Moto, LLC, was an undisclosed related party. The Bontias Report stated, in pertinent part:

## LARGEST CUSTOMER IS UNDISCLOSED RELATED PARTY FOD CAPITAL

Additional evidence corroborates that there exists little demand for Arcimoto's vehicles from independent paying customers.

Our findings revealed that as of March 2021, Arcimoto Key West had 13 Arcimoto vehicles on-site, making it the single largest location of Arcimoto vehicles worldwide outside of Eugene, Oregon (Arcimoto's HQ).

In 4Q'19, Arcimoto announced its first rental franchisee customer in Key West as R-Key-Moto, LLC ("R-Key-Moto").

*Arcimoto Founder Mark Frohnmayer boasted on FUV's 1Q'20 earnings call that R-Key-Moto was "almost up to their full plan of 20 vehicles."*

*In Arcimoto's 3Q'2020 earnings conference call webinar highlighted [sic] the franchisee partnership as a success.*

\* \* \*

However, *Arcimoto never mentioned in its investor communications via SEC filings, presentations, earnings calls or promotional videos that R-Key-Moto is an undisclosed related party owned by insider FOD Capital, LLC* ("FOD Capital").

While Founder Mark Frohnmayer boasted in the 1Q'20 Earnings Call that R-Key-Moto was "almost up to their full plan of 20 vehicles", *Arcimoto never disclosed any related party revenues from FOD Capital, which at US$ 20,000 per vehicle would amount up to US$ 420,000, or 29% of Arcimoto's total product revenue in 4Q'19 and 1Q'20.*

*R-Key-Moto's 2020 Annual Report lists Michael Raymond and Matthew Strunk as Managers, who are respectively the Managing Director and Director of Accounting and Finance of FOD Capital.*

In addition, R-Key-Moto shares the same registered address as FOD Capital.

\* \* \*

In 3Q'20, *Arcimoto promoted a pilot program for its Deliverator vehicle with Wahlburgers Key West*, whipping up investors' hope for a nation-wide deal with the Mark Wahlberg restaurant chain.

> *Arcimoto once again failed to disclose that Wahlburgers Key West is actually operated as a franchisee location by Wahlkey, LLC ("Wahlkey"), which is owned by undisclosed related party shareholder FOD Capital.*

(Emphases added.)

29.    The Bonitas Report additionally revealed issues regarding Arcimoto's alleged partnership with HULA, stating, in relevant part:

### ARCIMOTO'S SAN DIEGO RENTAL PARTNER HULA CHOSE AYRO

On February 14, 2018, Arcimoto announced a 100-unit "pre-orders" from its partnership with Hula to launch EV Oasis, "a one-of-a-kind electric vehicle charging, education, and rental center in Southern California" ("Hula Facility") in San Diego, California.

> *At the time Hula's owner was an FUV shareholder, making it another transaction with an undisclosed shareholder.*

FUV updated investors on October 30, 2018 that it planned to open and operate the Hula Facility with Hula at a 4,491 square-foot facility at 630 Tenth Avenue, San Diego.

Hula's official Youtube channel contained two videos published in 1Q'19 that showcased Arcimoto's FUV vehicles in a retail rental location in East Village, downtown San Diego, CA.

> *Arcimoto Founder Mark Frohnmayer claimed on Arcimoto's 3Q'19 earnings call that the Hula Facility would open in 1Q'20. Arcimoto's SEC filings Arcimoto [sic] reported that it had co-leased the Hula Facility whereby Hula would pay 65% of the rent for the Hula facility.*

Arcimoto's 2019 10-K filed on April 14, 2020 disclosed that Hula had yet to make the promised rental payments.

> *On November 10, 2020, Hula uploaded a new video from a different warehouse in National City that was full of Ayro 311 vehicles from Arcimoto's direct competitor.*

(Emphases added.)

30.    On this news, Arcimoto's stock price fell $1.10 per share, or approximately 6.56%, to close at $15.67 per share on March 23, 2021, damaging investors.

31.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the publicly traded securities of Arcimoto during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

33.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

34.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

35.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

36.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

37.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

38.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities are traded in efficient markets;

(d)    the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)    the Company traded on the NASDAQ, and was covered by multiple analysts;

(f)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)    Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)    Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's share price during the Class Period.

39.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

40.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

41.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

42.     This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

43.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

44.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

45.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

46.     The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

47.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

48.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

49.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

50.     By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

<u>**COUNT II**</u>

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

51.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

52.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

53.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

54.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

55.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company.  By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

56.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  May 20, 2021                       Respectfully submitted,

                                          POMERANTZ LLP

                                          */s/ Jeremy A. Lieberman*
                                          Jeremy A. Lieberman
                                          J. Alexander Hood II
                                          James M. LoPiano
                                          600 Third Avenue
                                          New York, New York 10016
                                          Telephone: (212) 661-1100
                                          Facsimile: (212) 661-8665
                                          jalieberman@pomlaw.com
                                          ahood@pomlaw.com
                                          jlopiano@pomlaw.com

                                          *Attorneys for Plaintiff*

**CERTIFICATION PURSUANT**
**TO FEDERAL SECURITIES LAWS**

1.    I, <u>Roger Gibson</u>, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 (the "Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 (the "Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against Arcimoto, Inc. ("Arcimoto" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire Arcimoto securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or the Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Arcimoto securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    The attached sheet lists all of my transactions in Arcimoto securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct.

**Executed _____4-6-21_____**
                    **(Date)**


_____
                    **(Signature)**


_____Roger Gibson_____
                    **(Type or Print Name)**

**Arcimoto, Inc. (FUV)**                                                                  **Gibson, Roger**

**List of Purchases and Sales**

| Transaction Type | Account Number | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Purchase | Account 1 | 11/20/2020 | 72 | $14.6000 |
| Purchase | Account 1 | 11/24/2020 | 2 | $15.0490 |
| Purchase | Account 1 | 12/7/2020 | 16 | $11.4889 |
| Purchase | Account 1 | 12/21/2020 | 2 | $13.9736 |
| Purchase | Account 1 | 1/20/2021 | 6 | $17.9815 |
| Purchase | Account 1 | 2/23/2021 | 7 | $17.8025 |
| Purchase | Account 1 | 2/23/2021 | 55 | $17.1646 |
| Purchase | Account 1 | 2/23/2021 | 1 | $16.9750 |
| Purchase | Account 1 | 3/5/2021 | 17 | $13.3757 |
| Sale | Account 1 | 11/24/2020 | (72) | $14.9375 |
| Purchase | Account 2 | 12/8/2020 | 1 | $11.9867 |
| Purchase | Account 2 | 1/4/2021 | 1 | $12.8250 |
| Purchase | Account 2 | 2/4/2021 | 8 | $33.7675 |
| Sale | Account 2 | 1/25/2021 | (2) | $20.6550 |